UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

KATINA M. HOUSMAN,                    )
                                       )
            Plaintiff,                )
                                       )
      vs.                             )        Case No. 1:14CV108 CDP
                                       )
CAROLYN W. COLVIN,                    )
Acting Commission of Social Security, )
                                       )
            Defendant.                )

## MEMORANDUM AND OPINION

This is an action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for

judicial review of the Commissioner's final decision denying Katina M.

Housman's application for supplemental security income (SSI) under Title XVI of

the Social Security Act.  42 U.S.C. §§ 1381 *et seq*.  Housman claims she is

disabled because she suffers from a combination of impairments, including

anxiety, panic attacks, disc dehydration (neck and back) and disc herniation

(encroachment of cervical cord).  After a hearing, the Administrative Law Judge

concluded that Housman is not disabled**.**  Because I conclude that the ALJ's

decision is supported by substantial evidence in the record as a whole, I will affirm

the decision.

# I.   PROCEDURAL HISTORY

Housman filed her application for supplemental security income benefits on September 20, 2010.  She alleged an onset date of April 13, 2010.  When her application was denied, Housman requested a hearing before an administrative law judge.  She then appeared at an administrative hearing on December 13, 2012 in Cape Girardeau, Missouri, where she was represented by attorney Kevin Posch.  Housman and a vocational expert testified at the hearing.

After the hearing, the ALJ denied Housman's application, and she appealed to the Appeals Council.  On May 27, 2014, the Council denied Housman's request for review.  The ALJ's decision thereby became the final decision of the Commissioner.  *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Housman now appeals to this court.  She argues that the ALJ erred by (1) failing to give proper weight to the opinion of Housman's treating physician, Robert Robbins, D.O.; and (2) failing to provide a sufficient medical basis for his residual functional capacity (RFC) finding after excluding Robbins' opinions.  Housman claims these mistakes led to a decision by the ALJ that was not supported by substantial evidence and should be reversed or remanded for further evaluation.

## II.    **EVIDENCE BEFORE THE ADMINISTRATIVE LAW JUDGE**[1]

### **Function Report**

Housman completed a function report for herself on September 30, 2010. She reported that she lives with her family, and her day consists of getting her son up for school, doing (or trying to do) housework like "laundry, dishes, beds," and attending any appointments. She wrote that before completing all of these things, she has to lie down due to weakness or dizziness. At the end of the day, she reported that she gets her son off of his bus, makes dinner and watches T.V. She also noted that "now" after she gets her son to school she lays down because sitting makes her uncomfortable due to dizziness, nausea, and back pain.

Housman reported that she washes her son's clothes, cleans his room, prepares his meals, and plays with him. She wrote that friends and family sometimes take her to the doctor if she is having a bad day. She noted that her personal care and grooming are not affected by her condition, but she does not sleep well at night and needs reminders to take medicine. Housman wrote that she prepares meals daily but they are usually quick because she gets dizzy. She reported that she sometimes cleans and does laundry, though friends and family

---

[1] Housman is challenging the weight given to medical source statements opining as to her physical functional capacity, and she claims that there was not substantial evidence to support the ALJ's RFC once those opinions were discounted. She is not challenging the ALJ's RFC as to her mental limitations; therefore, my discussion of the medical evidence focuses primarily on records addressing Housman's physical health and abilities.

help her with both, on occasion.  Housman wrote that she goes outside at least once a day, and is able to drive and ride in a car, but she does not go out alone due her dizzy spells and no longer drives a car.  She reported that she shops in stores, by phone, and on the computer, spending around 30 minutes in a store.  She checked boxes indicating she can pay bills, count change, handle a savings account, and use a checkbook.

For hobbies, Housman wrote that she enjoys watching television and playing with her son, but she does not do these things as often as she would like because she gets tired, weak, or dizzy.  Socially, she reported that she talks to people on the phone every day, and that she goes to conferences at her son's school and to his doctor appointments.  She noted that she has some trouble getting along with other people because her condition makes her agitated.  She wrote that often she does not feel up to participating in social activities.  She indicated that her condition affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, complete tasks, concentrate, use her hands, and get along with others because she has back pain, dizziness, and numbness in her hands.  She wrote that she can get dizzy walking a distance equal to walking from the living room to the kitchen and needs a thirty minute rest to recover.  She wrote that she can pay attention for only 10-15 minutes at a time but is "OK" at following written and spoken instructions and getting

along with authority figures. She noted she does not handle stress or changes in her routine well.

## Medical Records[2]

On June 25, 2010, Housman was admitted to Missouri Delta Medical Center for complaints of abdominal pain and cramps. X-rays taken of the chest and abdomen were normal, but they revealed the presence of osteoarthritis in both of Housman's hips and minimal curvature of her lumbar spine. [Tr. 191-196].

On August 2, 2010, an x-ray was taken of Housman's neck and reviewed by Dr. Mahmoud Ziaee. The x-ray showed severe osteoarthritis of C5-C6 with "large anterior and posterior spur formation and joint space narrowing with degenerative disc disease." It also showed minimal osteoarthritis of C6-C7. [Tr. 225].

On August 18, 2010 an x-ray was taken of Housman's lumbosacral spine and reviewed by Dr. Ziaee. This x-ray showed curvature of the lumbar spine to the left side, and minimal to moderate osteoarthritis mostly of L1-L4, with joint space narrowing. [Tr. 226].

An MRI of Housman's cervical spine was done on September 1, 2010. Dr. Ziaee reviewed the MRI and found disk dehydration mostly of C5-C6. He also found a "combination of posterior osteophyte and disk herniation causing significant encroachment of the cervical cord in the central and right side at C5-

---

[2] Although I have carefully reviewed all of the medical evidence, only medical records relevant to the ALJ's decision and Housman's challenges to the ALJ decision are discussed.

C6." With this, he noted that there was "extrinsic pressure over the thecal sac and edema with significant narrowing of the neural foramen on the right side." He noted C6-C7 and the rest of the examination showed no abnormalities. [Tr. 228-229].

On September 16, 2010, Housman was admitted to Missouri Delta Medical Center for a complaint of neck pressure radiating to her head and causing dizziness, nausea, and eye crossing. Dr. Ziaee ordered a CT scan of Housman's brain. The scan showed no acute hemorrhage or infarct. It did show a "small focal area of lucency of the right basal ganglia" that Dr. Ziaee determined could be a small arachnoid cyst or a small old lacunar infarct. Housman was discharged the same day. [Tr. 185-190].

On October 13, 2010 Housman saw a neurologist, Dr. Syed Afraz Salahuddin, for complaints that in July her face, right arm, and right leg had gone numb. She reported to him that since that time, her right eye, and vision in her right eye, had not felt right. Dr. Salahuddin ordered an MRI of Housman's brain, noting that she had already had an echocardiogram done in July, a CT scan of her head done in October, and a carotid doppler done in September, none of which were significant. He also opined that her herniated disk at C5-C6 might explain her right arm weakness but the facial numbness and leg symptoms could not be explained at that time. [Tr. 281-82].

Housman was admitted to Saint Francis Medical Center on October 20, 2010, complaining of neck pain, dizziness, and nausea. She was diagnosed with neck pain and a tension headache, given Ketorolac Tromethamine for her pain, and discharged the same day. [Tr. 208-214].

On October 28, 2010, Housman was seen for the first time by neurosurgeon Dr. Brandon Scott. Scott's notes indicate Housman reported having had neck pain since 2009 and that she also had pain down her right upper extremity, involving some numbness s and tingling in her hand. After reviewing the MRI of Housman's spine, Scott concluded she had a "herniated disc at C5-C6, right with C6 radiculopathy on the right." After discussing her options with Dr. Scott, Housman opted to proceed with conservative treatment for her disc herniation. [Tr. 235-36].

On November 24, 2010, Housman was seen by Dr. Jeffrey Steele for consideration of a cervical epidural steroid injection. He concluded that a steroid injection would have a significant chance of exacerbating Housman's symptoms, and Housman elected not to proceed with it. [Tr. 329-330].

On December 9, 2010, Housman followed up with Dr. Scott, and he scheduled her for an anterior cervical discectomy and allograft fusion at C5-C6. [Tr. 234]. Dr. Scott performed the discectomy and allograft fusion on January 3, 2011. [Tr. 218-223].

On February 8, 2011, Housman was seen by Dr. Scott for her one-month follow-up after surgery. His note states Housman reported doing well with intermittent pain down her right arm stopping at her elbow. She reported some numbness and tingling in her wrist extending into her fingers, but she stated this was intermittent and she was "not too concerned." Housman reported her cervical pain and pressure was gone. [Tr. 233]. The same day, she had x-rays taken that showed "[s]table anterior longitudinal cervical spine fusion changes at C5-C6." [Tr. 317].

On March 8, 2011, Housman had a two-month follow-up visit with Dr. Scott. His report notes Housman was happy with her surgery. [Tr. 338]. The same day, she had x-rays taken that indicated a "[s]table anterior fusion at C5 and C6 with normal alignment of the cervical spine." [Tr. 316].

On April 6, 2011, Housman had a follow-up with Dr. Scott. His report notes Housman stated she had no cervical pain and was happy with her surgery. [Tr. 337]. Housman had x-rays taken the same day that showed her "anterior longitudinal cervical spinal fusion at C5-C6" was stable and that she had mild degenerative disk disease at C4-C5. [Tr. 315].

In a note from May 20, 2011, an assistant from Dr. Scott's office noted that after she called in a refill on Housman's hydrocodone, she received a call back from the pharmacist stating that she had also been getting hydrocodone from Dr.

Robbins and had been for several months. Dr. Scott's assistant cancelled the refill and informed Housman that she was not permitted to get narcotics from more than one doctor. [Tr. 335].

An x-ray of Housman's lumbar spine was taken on July 8, 2011, and reviewed by Dr. Ziaee. He reported that the x-ray showed "moderate osteoarthritis of articular facet of lower lumbar spine and minimally to moderately of the vertebral body." He noted that there was slight joint space narrowing of L3-L4 and minimal curvature of the lumbar spine. [Tr. 406]

On November 22, 2011, Housman was seen by Dr. Ken Stone in the Missouri Delta Medical Center emergency room for complaints of chronic lower back pain. He noted that she had recently fallen and had a "contusion just superior to the left gluteal region." He noted that most of her pain was "directly in the paraspinal muscles from the mid thoracic spine down into the paraspinal muscles of her lumbar spine." He noted that she had had many x-rays, and in an effort to limit her exposure to radiation, and after her approval, he would be treating her symptomatically without "further investigation." He informed Housman that if she had continued discomfort at the same level in a week, then a CAT scan or an MRI of the area would be appropriate. He prescribed her Lorcet for the pain. [Tr. 401-405].

On June 25, 2012, Housman presented at the Missouri Delta Medical Center Emergency Department complaining of dizziness and right-sided body trembling. A CT scan of her head was done and found to be unremarkable. The provider who saw her diagnosed her with malaise, weakness, and a urinary tract infection. She was prescribed an antibiotic and discharged the same day. [Tr. 396-400]

An MRI of Housman's lumbar spine was taken on July 10, 2012 and reviewed by Dr. Andrew West. Dr. West found the MRI showed "[n]o focal disc herniation or significant central spinal canal stenosis"; "[m]ild bilateral L4-L5 foraminal stenosis;" "[m]ultilevel facet arthropathy;" and "[c]hronic T11-T12, L1-L2 and ventral superior L4 Schmorl's nodes." [Tr. 312].

On September 11, 2012, Housman was seen by Dr. Scott for complaints of lower back pain. She reported that the pain began more than five years prior to the appointment and became worse a year prior to the appointment. She characterized the pain as aching, sharp, stabbing, and burning, with some pain radiating to her right leg. She reported numbness and/or tingling in her right thigh, knee, calf, ankle, and foot, and weakness in her legs. She reported that the pain was aggravated by walking, sitting or standing and relieved by medication. Dr. Scott reviewed Housman's MRI and noted that he did not see "any significant pathology that would be causing her symptoms." He felt conservative treatment was the best

option and noted that Housman would be talking to Dr. Robbins about a possible pain management consultation. [Tr. 332-33].

### *Dr. Robbins' Records*

Housman was first seen by Dr. Robert L. Robbins in September 2009. She initially came in with complaints of possible anxiety attacks, low back pain, and stress. He or Sherri L. McDonald, a nurse practitioner working in his office, saw Housman approximately seven times between her first visit and early March 2010. Over the course of this time, after trying other medications, Dr. Robbins and McDonald eventually landed on Xanax and Lorcet (hydrocodone and acetaminophen) to control Housman's stress/anxiety and back pain, respectively. [Tr. 254-261].

Dr. Robbins' notes from Housman's March 13, 2010 visit indicate she reported "some discomfort and muscular spasm in the back of her neck, particularly on the left side and into the left shoulder." He assessed her with musculoskeletal dysfunction of the neck and noted that there did appear to be some muscular spasm to the neck and some slight decreased range of motion of flexion. He continued her Xanax and Lorcet and started her on Flexeril for her neck. [Tr. 253]

From April 8, 2010 to July 1, 2010, Housman was seen by Robbins or McDonald approximately four times. She occasionally reported neck pain and was

assessed with musculoskeletal dysfunction of the neck. She was prescribed Soma (muscle relaxant) instead of Flexeril for her neck pain.

Robbins' notes from August 2, 2010 state that Housman continued to have headaches starting in her neck and going into her head that he felt were probably "stress, tension type although that is not known for sure." He noted she had known neck dysfunction, and her neck had decreased range of motion with some pain and spasm. He sent her to the hospital for x-rays of her neck. He continued her Soma, Lorcet and Xanax. [Tr. 247].

On August 6, 2010, Robbins' notes state Housman's recent x-rays showed she had severe osteoarthritis of C5-C6 with joint space narrowing with anterior/posterior perforation and minimal osteoarthritis of C6-C7. She had decreased range of motion in her neck with pain and spasm. She also had low back pain. [Tr. 246]

Robbins' notes from Housman's visit on September 2, 2010 state that x-rays of her low back were consistent with curvature of the lumbar spine of the left side, minimal to moderate osteoarthritis, especially L1-L4 and joint space narrowing. He noted that she reported having a lot of pain with day-to-day activities including "those with her husband." Her lower back had decreased range of motion with spasm. It was difficult for her to spread her legs very much. Robbins' notes state

they would be pursuing an MRI of her lumbar and thoracic spine due to reported pain in those areas. He continued her Soma, Xanax, and Lorcet. [Tr. 245].

Housman saw Dr. Robbins on September 9, 2010 for follow up regarding musculoskeletal dysfunction of the neck with pain. He noted that he had the results of the MRI, which indicated she had some encroachment of C5-C6, extreme pressure over the fecal canal and encroachment over the cervical cord. He noted that these findings fit the existing clinical picture of her symptoms and assessed her with cervical disc disease. [Tr. 244].

Housman was seen by Dr. Robbins on October 4, 2010 for follow up regarding her cervical disc disease and dizziness. Dr. Robbins' notes indicate Housman had an appointment with a neurosurgeon scheduled for October 28 regarding her cervical disc disease. [Tr. 242].

Dr. Robert Robbins' notes from a visit with Housman on October 28, 2010 state that she had been to see Dr. Scott who diagnosed her with cervical disease. Dr. Robbins increased her Lorcet dose to two, three times a day. He continued her Xanax and increased her Soma. [Tr. 239]

Housman saw Dr. Robbins on November 29, 2010 for follow up regarding her cervical disc disease. Dr. Robbins' notes indicate Housman was sent to Pain Management by Dr. Scott, but they opted not to give her a shot for her pain. She planned to follow-up with Dr. Scott for potential surgical treatment. Dr. Robbins

continued Housman's Soma with Lorcet and Xanax. He noted her neck had decreased range of motion with pain particularly involving the right side. [Tr. 238]. Dr. Robbins saw Housman again on December 29, 2010, at which time he noted that she was scheduled for cervical disc surgery with Dr. Scott on January 3, 2011. [Tr. 347].

Housman was seen by Robbins or McDonald approximately nine times between 1/7/11 and 4/19/11. During those visits, other than noting that Housman had had neck surgery and, for a period, was wearing a neck brace, nothing remarkable was reported regarding her neck or back. However, her Lorcet, Soma, and Xanax prescriptions were continually refilled. [Tr. 348-356].

On May 16, 2011, Housman was seen by Dr. Robbins for complaints of lower back pain. She reported having jumped out of the window of a truck and jarred her lower back. She had pain down both legs. Dr. Robbins assessed her with a sprain or strain of the lower back and prescribed her Ibuprofen. [Tr. 357]

The next time Housman was in Robbins' office was on April 3, 2012, when she was seen by McDonald. Housman reported low back pain radiating toward her lower right extremity with some numbness. An x-ray of her lumbar spine showed limbus vertebrae and mild degenerative disc disease from L3 to S1. McDonald noted that they hoped to get Housman in for an MRI of her lumbar spine soon. [Tr. 358].

On April 23, 2012, Housman was seen by McDonald for follow-up on her stress. McDonald noted Housman had "a lot of issues going on with her family" at the time of the visit, but she had been seeing a counselor 2-3 times weekly, and that was helping with her stress issues. McDonald's notes from this visit do not mention anything about Housman's back or neck. [Tr. 359].

Housman was seen by McDonald against on April 30, 2012. Housman reported she was still having a lot of trouble with lower back pain. She said it radiated toward her right lower extremity and she still had some numbness. She reported that "at times" it made her limp. McDonald's notes state that she was going to try to get an MRI scheduled for Housman for her lower back. [Tr. 360].

On May 29, 2012, Housman saw McDonald for follow-up on all of her conditions. McDonald's notes state that Housman had an MRI of her lower back scheduled for June 1, 2012. Housman continued to complain of lower back pain radiating toward her right lower extremity and occasional numbness. [Tr. 361].

Housman was seen by Dr. Robbins on June 28, 2012, but no substantive information was included in Robbins' notes regarding Housman's lower back pain. He did report that Housman was trying to walk (for exercise) and her pain threshold was about a 4. [Tr. 362].

On July 24, 2012, Housman was seen by McDonald and reported that she was still having lower back pain that at times radiated toward her right hip and

lower extremity. The MRI of her lower back showed that there was a disc bulge at L4-L5 and L5-S1. It showed that there was mild bilateral L4-L5 foraminal stenosis. McDonald noted that they would try to send Housman back to Dr. Scott as she had previously seen him for her cervical issues. [Tr. 363].

On September 10, 2012 Housman complained to McDonald of extreme stress. McDonald noted that Housman was still dealing with her low back pain and that she had an appointment to see Dr. Scott on September 11, 2012. [Tr. 365].

On September 19, 2012, Housman saw McDonald for follow-up regarding all of her conditions. Among other things, Housman reported she was still having "issues" with her lower back. She had seen neurosurgeon Dr. Scott, and he had suggested a referral to the pain clinic. McDonald noted that she was going to try to get Housman an appointment at the pain clinic. [Tr. 366]

### Medical Source Statements – Physical

Dr. Robert Robbins completed his first Medical Source Statement–Physical for Housman on June 14, 2011. It consists of a series of check-marked boxes. In it, Robbins opined that, frequently and occasionally, Housman could only lift or carry less than five pounds. He reported that she could stand and/or walk continuously for less than 15 minutes and for a total of less than one hour in an eight-hour day. He opined that she could sit continuously for 30 minutes and for a total of less than one hour in an eight-hour work day and that she was limited in

16

her ability to push or pull.  He opined that Housman could climb, balance, reach, handle, finger, and feel only occasionally.  He found that she could never stoop, kneel, crouch, crawl, speak, hear, or see (with near acuity, far acuity, or depth perception).  He determined she should avoid moderate exposure to extreme cold or heat, weather, wetness/humidity, dust/fumes, vibration, hazards, and heights. He noted that her pain limits her activity and creates a need for her to lie down frequently for periods of 30 minutes.  [Tr. 296-97].

Dr. Robbins completed a second Medical Source Statement – Physical for Housman on July 24, 2012.  It also consists of a series of check-marked boxes.  In it, Robbins opined that frequently and occasionally, Housman could only lift or carry less than five pounds.  He reported that she could stand and/or walk continuously for less than 15 minutes and for a total of less than one hour in an eight-hour day.  He opined that she could sit continuously at one time for less than 15 minutes and for less than one hour total in an 8-hour day.  He found that her ability to push and/or pull was limited.  Dr. Robbins indicated that Housman could never climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger, or feel. But she could frequently see, speak, and hear.  He opined that Housman should avoid any exposure to extreme cold, extreme heat, weather, wetness/humidity, dust/fumes, vibration, hazards, and heights.  He indicated that Housman does suffer from pain requiring her to lie down or recline to alleviate symptoms in an 8-

hour work day but he did not opine as to how often or for how long. Finally, he wrote that Housman's "pain causes limitations in movement and range of motion." [Tr. 371-72].

### Housman's Testimony before ALJ

At the administrative hearing before the ALJ on December 13, 2012, Housman testified that she started but did not finish the tenth grade, that she lives in an apartment with her husband and her 13year-old son, and that her husband does not work. She testified that for income, she receives $219 through the Division of Family Services, and she has done so since sometime in 2009 or 2010. [Tr. 423-24].

Housman testified that her job at Wal-Mart required her to stock shelves in the dairy and frozen department. It ended when she asked for an extension on the 12-week medical leave she had taken to care for her son. Wal-Mart terminated her instead of granting the additional leave. [Tr. 425]. Housman also testified that she had held a job as a housekeeper at a Ramada Inn, but when she became pregnant with her son, the doctor put her on medical leave because it was a high risk pregnancy. [Tr. 425].

As for her health problems, Housman stated that her biggest problem is that she has a plate in her neck from surgery and it causes pain all the way down to the lower part of her back. She testified that knots build up around the plate and she

experiences a "pulling" and aching pain from it that lasts all day, every day. On a scale of 1 to 10, ten being a "straight to the emergency room" type of pain, Housman rated her pain as a 10. She testified that at least a couple of times a week she is unable to get out of bed, and sometimes her neck issues cause her right leg to collapse. [Tr. 427-28]. She testified that she has fallen before and has to hold onto things as she walks around her house. [Tr. 429].

Housman testified that she has carpal tunnel syndrome in her hands that periodically causes her hands to "draw up" and drop anything she's holding. It also keeps her from having fine motor skills—for instance, she is unable to pick up small things like a paperclip or coin. [Tr. 430-31].

Housman testified that she has pain, including bad headaches, at least three times a week. Staying in bed makes her pain better. She testified that she also takes Hydrocodone and the muscle relaxer Soma for her pain, both of which are controlled by Dr. Robbins. Housman testified that her doctors have tried to make appointments for her to get "pain injections" for her back, but she had not yet been able to make it to the pain clinic because her brother was ill. [Tr. 431-33].

Housman stated that she has anxiety that causes tightness in her chest three or four times every day. She testified that she cannot be around a large crowd and has some trouble grocery shopping. She testified that when she grocery shops she just gets what she needs and then goes, but lately she said she has s been sending

her niece or her husband to do the shopping because she "went off" on a cashier once and "didn't like it." She was seeing Kay Hunter for psychological treatment but testified that Hunter recently retired. [434-35].

Housman testified that she also has depression that causes her to stay in bed some days and also causes crying spells four or five times a day, three to four days a week. She takes Cymbalta for her depression, which she testified helps temporarily but does not fully control her symptoms. [Tr. 436-37]. As for household chores, Housman testified that she tries to do chores but the pain makes it difficult for her to sit and stand, and her carpal tunnel makes it difficult for her to grip things. She testified that she cannot do laundry because she has back pain when she reaches to pull clothes out. [Tr. 437-438].

Housman testified that Dr. Scott told her that her back was not serious enough to warrant surgery yet and referred her to the pain clinic. She testified that she can stand for 10 to 15 minutes at a time and sit for 10-20 minutes at a time. She testified that she leaves the house a couple of times a day on a "good day." She often visits her mother for a few hours during the day. [Tr. 438-440]

### Vocational Expert's Testimony

Vocational expert Carly Coughlin also testified before the ALJ. The ALJ asked her to classify Housman's two most significant past jobs – as a stocker at

Walmart and a housekeeper at a Ramada Inn. Coughlin classified them as (1) stock clerk–heavy with an SVP of 4; and (2) housekeeper–light with an SVP of 2.

The ALJ then asked Coughlin to consider a hypothetical individual, under the age of 50 who could lift 20 pounds occasionally and 10 pounds frequently; who could stand and walk a total of six hours in an eight hour day; who would need to change position for a minute or two about once an hour but would not have to walk away from the work station; who could never climb ladders, ropes, or scaffolds; who could occasionally balance, kneel, crouch, crawl, stoop , and climb ramps and stairs; who could frequently handle and finger; and who could perform simple, routine tasks in non-public settings. Coughlin testified that the ALJ's hypothetical person could not perform any of Housman's past work, but such a person could perform work as an assembler, a touch-up board assembler, or a sorter of agricultural produce.

Then ALJ then asked Coughlin to add the restriction of only occasional handling or fingering, and Coughlin testified doing so would rule out the three jobs she named. The ALJ then asked Coughlin to assume the first hypothetical applied again except the person could only lift 10 pounds at maximum. Coughlin testified that such a person could perform work as a circuit board assembler, a final assembler, or a surveillance system monitor. Coughlin testified that in these jobs a person would have two fifteen minute breaks and one thirty minute break. She

testified a person could be off-task about 5% of the time outside of those customary breaks, and a person could be absent a maximum of one day per month. A person would not be permitted to lie down or recline in those jobs.

Housman's attorney then asked Coughlin to consider a hypothetical person who could both frequently and occasionally lift less than five pounds, walk continuously for fifteen minutes for a total of less than one hour in an eight-hour day, and sit continuously for less than fifteen minutes for a total of less than one hour during an eight-hour day. Coughlin testified there would be no job for such a person.

## III.    STANDARD FOR DETERMINING DISABILITY UNDER THE SOCIAL SECURITY ACT

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure. 20 C.F.R. § 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity.  If so, he is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work.  If the claimant can perform past relevant work, he is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, he is declared disabled.  20 C.F.R. § 404.1520; § 416.920.

# IV.    THE ALJ'S DECISION

Applying the five-step sequential evaluation, the ALJ first determined that Housman had not engaged in substantial gainful activity since the date she applied for SSI benefits, September 20, 2010.

At step two, the ALJ found that Housman had severe impairments of degenerative disc disease of the cervical and lumbar spine, depression, anxiety, and posttraumatic stress disorder.

At step three, the ALJ determined that Housman does not have an impairment or combination of impairments that meets a listing.  He concluded that Housman's degenerative disc disease did not meet the requirements of a listing contemplated under section 1.00 of 20 CFR Part 404 , Subpart P, Appendix 1 because she does not have an inability to ambulate effectively, a major dysfunction of any joint, an inability to perform fine and gross motor movements effectively, or consistent medical evidence over a 12-month period of nerve root compression.

The ALJ found that none of Housman's mental impairments singly or in combination meets or medically equals the criteria of listings 12.04 and 12.06.

Next, the ALJ found Housman has the residual functional capacity to perform light work as defined in 20 CFR § 416.967(b).  As such, she could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 6 hours in an 8-hour day, and sit for 6 hours in an 8-hour day.  He found that

Housman should have the option to change position for 1-2 minutes once per hour, but would not have to walk away from the workstation, and he concluded she is limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing stairs and ramps, and never climbing ladders, ropes, or scaffolds. He concluded she can perform frequent handling and fingering with the bilateral upper extremities. Mentally, he concluded she is limited to performing simple, routine tasks in a non-public setting.

In fashioning Housman's RFC, the ALJ determined that although Housman's medically determinable impairments could reasonably be expected to cause her alleged symptoms, he found her statements as to the intensity, persistence and limiting effects of the symptoms not entirely credible

The ALJ noted that there was no evidence that Housman's prescribed medications were not generally effective when taken or that they imposed significant adverse side effects. He noted that Housman was not being prescribed any narcotics in the strongest tier and although her anti-depressant and anti-anxiety medications had varied, the drugs were not known for being particularly strong.

The ALJ determined that Housman's work history prior to the alleged disability onset date did not enhance or detract from her credibility, as her work ended for reasons not related to her medical condition. He opined that Housman's daily activities are inconsistent with her allegations of disabling symptoms and

limitations.  He noted that she is able to care for her son, care for her own personal needs without difficulty, and perform household chores, including cooking, cleaning, laundry, shopping, and paying bills.  The ALJ noted that Housman testified she visits her mother for a few hours daily, and her medical treatment notes do not document an inability to lift more than 5 pounds, stand longer than 10-15 minutes at a time, or sit longer than 10-20 minutes at a time.

The ALJ opined that the severity of Housman's subjective complaints was not supported or consistent with the clinical signs, symptoms and findings of the objective medical evidence of record.  He summarized Dr. Robbins' and Dr. Scott's treatment records for Housman's neck and back.  He discussed Dr. Robbins medical source statements and accorded them no weight because they were not well supported, they were inconsistent with Dr. Robbins' own medical treatment records, and Dr. Robbins is a primary care provider, not an orthopedic specialist or a neurosurgeon.  The ALJ noted that Dr. Robbins' suggested limitations implied that Housman would be lying down more than six hours in eight, and Housman never testified to this much lying down during the day.  The ALJ also noted that Dr. Robbins' medical source statements limit Housman to lifting no more than five pounds, but his treatment records do not note any such extreme restriction on lifting.  The ALJ opined that it is reasonable to conclude that if the claimant were restricted to such an extreme limitation, then Dr. Robbins would have documented

imposing that restriction in his actual medical treatment notes. Additionally, the extreme restrictions on climbing, balancing, stooping, kneeling, crouching, crawling, reaching, and handling that Dr. Robbins indicated in his statement would render Housman unable to ever sit down, get in a car, bathe, dress, put on shoes, eat or drink. The ALJ noted that such an extreme degree of limitation has never been alleged and is not supported in the record. Additionally, in his medical source statement, Dr. Robbins did not write any reasons for the limitations that he checked off, and the ALJ noted again that Dr. Robbins is a primary care provider, not an orthopedic specialist or a neurosurgeon.

The ALJ determined that greater weight should be given to the treatment records of neurosurgeon Dr. Scott, who indicated that Housman was satisfied with her neck surgery and noted that the MRI of Housman's spine did not demonstrate pathology justifying her complaints of back pain and lumbar radiculopathy.

At step four, in light of Housman's RFC, the ALJ relied on the testimony of the vocational expert in determining that Housman is unable to perform past relevant work.

At step five, the ALJ again relied on the vocational expert's testimony in determining that Housman is capable of making a successful adjustment to other work that exists in significant numbers in the national economy and concluded that Housman was not disabled.

## V.    STANDARD OF REVIEW

This court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2003).  "Substantial evidence" is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion.  *Id.*  When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005), or because the court would have weighed the evidence differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

## VI.   DISCUSSION

Housman alleges the ALJ erred by (1) failing to give controlling weight to Dr. Robbins' opinions; and (2) after discounting Dr. Robbins' opinions, failing to provide a sufficient medical basis for his residual functional capacity finding.

### A.   Dr. Robbins' Opinions Should Not Be Accorded Controlling Weight

Housman argues Robbins' medical source statements as to the severity of her impairments should have been accorded controlling weight in determining her RFC. A treating physician's opinion is generally given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." 20 C.F.R. § 416.927(c)(2). "The statements of a treating physician may be discounted, however, if they are inconsistent with the overall assessment of the physician or the opinions of other physicians, especially where those opinions are supported by more or better medical evidence." *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) citing *Prosch v. Apfel*, 201 F.3d 1010, 1013–14 (8th Cir.2000).

In *Teague*, the Eighth Circuit held that substantial evidence supported the ALJ's decision to discount the opinion of a treating source regarding the claimant's functional limitations related to her back. In so concluding, the Court noted that the "check-off form" completed by the doctor did not cite clinical test results or

findings supporting his opinion, and his previous treatment notes "did not report any significant limitations due to back pain" and certainly did not indicate an inability to work. Additionally, testing done by other doctors revealed little objective evidence supporting the limitations asserted by claimant. *Teague*, 638 F.3d at 615.

Similarly, here, Dr. Robbins' medical source statements were "check-off forms" that did not cite any clinical test results or findings supporting his opinions. His statements advocated very severe restrictions on Housman's ability to function – including an inability to lift and carry five or more pounds, and a complete inability to climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger, or feel – but, as noted by the ALJ, none of these restrictions was discussed or indicated in Robbins' previous treatment notes.

The ALJ also found that Dr. Robbins' opinions conflicted with the testing and opinions of Dr. Scott. Dr. Scott's records indicated that Housman was satisfied with her cervical discectomy surgery (having reported no pain in her neck) and that an MRI of her lumbar spine did not show "any significant pathology that would be causing her symptoms." As noted by the ALJ, Dr. Robbins is a family practice doctor with no specialized knowledge of diseases or injuries that affect the neck, back, and spine, and his opinion was therefore entitled to less weight. *See* 20 C.F.R. § 416.927(c)(5) ("[w]e generally give more weight to the

opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"); *Hensley v. Barnhart,* 352 F.3d 353, 356 (8th Cir.2003) (ALJ's decision to discount treating physicians' opinions was proper where the opinions conflicted with those of a specialist).

Finally, the ALJ found that the extraordinary physical restrictions advocated by Dr. Robbins were not supported by Housman's reports of and testimony regarding her daily activity. Housman reported that she could perform her own personal care, do some household chores, care for her son, leave the house for school conferences and doctor visits, and drive a car. The ALJ opined that such activity is not consistent with Robbins' opinions that Housman could never balance, stoop, reach, or handle.

In light of the above, I conclude that substantial evidence supports the ALJ's decision to discount the opinions of Dr. Robbins.

B.     The ALJ Provided a Sufficient Medical Basis for His Physical Residual Functional Capacity Finding

Housman next argues that after discounting Dr. Robbins' opinions, the record does not contain sufficient evidence regarding her physical functional limitations, and as a result, the ALJ's RFC determination that she could perform light work was not supported by substantial evidence.

A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R.

§ 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart,* 363 F.3d 781, 783 (8th Cir.2004) (quoting *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir.2000)). The burden of persuasion to demonstrate RFC is always on the claimant. *Stormo v. Barnhart,* 377 F.3d 801, 806 (8th Cir.2004). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in the case." *Id.*

An RFC is based on all relevant evidence, but it remains a medical question and "some medical evidence must support the determination of the claimant's [RFC]." *Baldwin v. Barnhart,* 349 F.3d 549, 556 (8th Cir. 2003) (internal quotation marks and citation omitted). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).

In support of her argument, Housman relies primarily on *Taylor v. Astrue*, No. 4:11 CV 1747 RWS-SPM, 2012 WL 6953117 (E.D. Mo. Nov. 9, 2012) report and recommendation adopted, 2013 WL 328743 (E.D. Mo. Jan. 29, 2013). The claimant in *Taylor* suffered from scoliosis and degenerative changes in her spine. Although the ALJ determined that her impairments were severe, he discounted the

opinion of her treating physician as to her work-related restrictions and found that she still had the RFC to perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). *Id*. at *6. In support of his physical RFC determination, the ALJ referenced objective examination results, including an MRI that showed "degenerative changes most severe at the T9-T10 and T10-11 levels with moderate central canal stenosis impinging the central cord," and a physical therapist note reporting "significant increase in thoracic kyphosis and cervical forward head." This court held that the ALJ's determination that the claimant could perform light work was not supported by "some medical evidence." In so holding, the court found that the ALJ failed to explain how the cited objective reports led to the conclusion that the claimant could perform light work, and that such a conclusion was not apparent from the records alone. *Id*. at *11. The court noted that an "ALJ is not permitted to draw his own inferences from medical reports." *Id*.

In contrast to *Taylor*, the Eighth Circuit has upheld an ALJ's physical RFC determination supported by objective diagnostic tests where those tests indicated the claimant's physical ailments were not severe. In *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008), the Eighth Circuit noted that the medical record was "silent" with regard to the claimant's work-related restrictions. *Id*. at 876. Nevertheless, the Court upheld the ALJ's determination that claimant could perform light work

despite degenerative changes in her back. In so holding, the Court noted that the medical reports showing claimant had degenerative back problems tended to note that the problems were minimal or mild with no nerve root displacement and no spinal stenosis noted. These objective findings were sufficient to constitute some medical evidence supporting the ALJ's RFC. *Id*. at 875-76. *See also Cox v. Astrue*, 495 F.3d 614, 619-620 (8th Cir. 2007) (affirming ALJ's RFC determination where no medical opinion directly addressed how claimant's depression and anxiety affected her ability to work).

Here, the ALJ's determination is supported both by objective test results and by physician notes clarifying those test results. With regard to Housman's cervical neck pain, Dr. Scott's reports support the ALJ's determination that Housman's surgery in January 2011 largely resolved her neck issues. In his opinion, the ALJ noted that at Housman's post-operative office visits to Dr. Scott, Housman reported she was doing well, was happy with the surgical results, and was without neck pain. Post-surgical scans of her neck showed "stable anterior fusion at C5 and C6," the site of the surgery, with "normal alignment of the cervical spine." Additionally, Dr. Robbins' notes after Housman's 2011 neck surgery do not indicate that she continued to complain of neck pain.

With regard to Housman's back pain, the ALJ correctly noted that on April 3, 2012, lumbar spine x-rays showed only mild degenerative disc disease. An MRI

in July of that year showed mild right hypertrophic facet arthropathy at L2-L3, minor right greater than left facet arthropathy at L3-L4, diffuse disc bulge at L4-L5 and L5-S1, no significant central spinal canal stenosis anywhere, and only mild foraminal stenosis at L4-L5. [Tr. 312]. After this MRI, when Housman was again sent to Dr. Scott for a neurosurgery consult, Dr. Scott recommended only conservative treatment. He reported that he had reviewed her MRI and did not see "any significant pathology that would be causing her symptoms." He noted that he would let Housman speak with Dr. Robbins about a potential pain management consultation if she wished. [Tr. 333]. Dr. Scott's notes from this visit also state that Housman reported that pain medications relieved the pain associated with her back. [Tr. 332]. None of Dr. Scott's or Dr. Robbins' reports indicated that they prescribed any physical limitations for Housman based on her back problems.

I conclude that the evidence discussed above is sufficient to constitute "some medical evidence" supporting the ALJ's RFC determination. The scans taken of Housman's neck after her surgery indicated the surgical site remained stable and showed normal cervical alignment. To the extent any issues were noted in the x-ray and MRI results of Housman's back, they were "tempered in several instances" by the words "mild" or "minor." *See Steed*, 524 F.3d at 875.

Additionally, unlike *Taylor*, this is not a case where the ALJ was left to draw his own conclusions from obscure medical test results. Over the course of several

follow-up exams, Dr. Scott reported that Housman's neck surgery was successful and she no longer had pain.   With regard to Housman's back, Dr. Scott specifically stated that Housman's alleged back symptoms were not supported by her objective test results.

Housman has not challenged the ALJ's RFC in any other way.  In light of all of the foregoing, I conclude that the ALJ's RFC determination was supported by substantial evidence in the record.

## VII.   CONCLUSION

For the aforementioned reasons, the ALJ's determination that Housman is not disabled is supported by substantial evidence in the record as a whole and the decision should therefore be upheld.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the commissioner is affirmed.  A separate judgment in accordance with this Memorandum and Order is entered this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 21st day of September, 2015.